Thank you, Your Honor. Thank you. May it please the Court, Mr. Lamont, I'm James Tree. I'm representing Aaron Dubois in his claim for Social Security Disability Benefits. Mr. Dubois filed his claim in 2008, September of 2008. The month prior to that, in August of 2008, he went to an appointment that was scheduled for him by the Department of Vocational Rehabilitations. In the state of Washington, they have a mantra about DVR. It says, our passion is helping people with disabilities be able to work. Mr. Dubois didn't want to apply for disability. He had a loving mother that was a nurse that nurtured him. He had a father that showed tough love. He was an electrical inspector, ruled with an iron fist. So he kind of had bad cop, good cop in his life. He fostered a desire to all of this, according to Dr. Paul Schneider, who the ALJ's own vocational expert testified, was a very respected psychologist in the community and was very good at helping people get back to work with disabilities. But when Dr. Schneider, the only person that sent a comprehensive psychological evaluation to this record, performed his record, he didn't recommend a work program through fortunately for Mr. Dubois, he recommended an application for social security disability. Because, as Dr. Schneider said, there were just too many problems in too many domains. Well, he obviously does have a lot of problems and, you know, and it's always, it makes it a little harder because he can do a lot of things too. But his problems are such that being around people are clearly problematic for him because I know the record says he volunteers at a computer lab twice a week. He served as a worship leader in his church. He has friends and a girlfriend. He is active in his daily activities. I mean, even though his academics took a long time, he did ultimately earn a BS. And the ALJ's So why isn't that substantial evidence supporting the decision that his daily activities and social activities are such that, you know, he can do something? Yeah, I'd like to address that if I could in two ways, Your Honor. First of all, the ALJ significantly erred in his articulation in this case, because the administrative law judge didn't discuss or weigh the fact that it took him 10 years to get his bachelor's degree. He just said he got a bachelor's degree period. That really isn't all that unusual. There are a number of people who take extended periods of time. Yeah, but Go ahead. I'm sorry. I'm sorry. Okay. So why should the ALJ have to address that specifically? Because in this case, the reason he took time wasn't because he was partying or because he decided to go to work or because of this or that. It was because of his disability. And it's clear in the record that he needed a disability advisor. He had to have oral tapes, couldn't use textbooks. He had to have special accommodations. And he had them both at Yakima Valley Community College, where he was at for seven years, where he earned most of his credits. So they didn't have many credits left when he transferred to the Phoenix University online course. But there he had a disability advisor who was completely online. But the jobs that they're saying that he can do are not be a law clerk to a federal judge. What are the jobs that ultimately they said with the hypothetical post that he could do? There were like three jobs, right? Right. Yeah. And they were something like a weight measurer. What was that? What were the what were the other two? They were three labor jobs. Yeah, weight measure and machine sand tender. Sand presser. Yeah, jobs that... Well, they're not, they obviously aren't, you know, they're not necessarily contra to what his disabilities are. Except that Dr. Kester and Dr. Beatty, who were the two psychologists that the ALJ gave great weight to, had opined that he had certain limitations in their report. They're the state agency physicians. And when those limitations were given to the ALJ's vocational expert verbatim, word for word, the vocational expert said there'd be no jobs he could do, including those three jobs that the ALJ found he could do. But then the ALJ revised the hypothetical, right? No, the ALJ didn't give the hypothetical from his own experts that he his own RFC, what his RFC was. But he says, I give great weight to Dr. Beatty, and I give great weight to Dr. Kester, the state agency physicians, in his, in his... But what an ALJ does is you can still think that someone's telling the truth, but you don't have to agree with everything. You know, they make findings of fact, or they, they decide, well, I think based on, you know, the ALJ allegedly has more evidence than all of the doctors. You have the different doctors, you have people in the family reporting, you have the, the, the individual that's applying for disability saying what, how they lived their life, all of those things. And then, you know, what was wrong with what the ALJ's hypothetical was? Judge Callahan, the problem was, is that the, the judge could have done that. The ALJ could have said, I accept part of Dr., what Dr. Kester and Dr. Beatty says, I reject this part. And I find this, the judge didn't do that in this case. That's not this case. The ALJ said he accepted with, and gave great weight to all of Dr. Kester's opinions, but he didn't incorporate or encapsulate those opinions in his RFC. So when an ALJ gives great weight to a doctor, doesn't reject their opinion, he needs, the law says he needs to incorporate those and capture those opinions in his hypothetical. Clearly, he didn't in this case, because when those exact limitations from the doctors that he gave great weight to and didn't reject any of their opinions were given, the vocational experts said there was no jobs they could do, including those three jobs that we've talked about. Let me ask you about Dr. Colby. The, the ALJ doesn't mention Dr. Colby, although that's in the record. So, and Dr. Colby found that he had a decent chance of getting the, I think the social security benefits. And so then that applied that, that, what, what, I don't know what you call this, a GAX program certification, right? Correct. So I'm wondering really what the relevance of that is in the sense that it's a little bit like a preliminary injunction, like what we do. It's like, you'll look at a couple of things and you say, okay, cause he doesn't examine them. You know, he just looks at a couple of the things and then says, well, yeah, I got a So not mentioning that, why is that, why is that either even relevant or why is it not harmless error? Because social security says in a regulation, they say that a decision from another governmental agency is evidence that shall be considered. Now we've attached an appeals counsel order where the appeals counsel in rebuttal to a counsel's argument in their brief that the, although the ALJ doesn't have to accept the opinion of Dr. Colby and Washington state that Mr. Du Bois is disabled, they have to consider it. Okay. And it wasn't the record. It wasn't the record. So what is the best authority that you have to mention it? So 20 CFR 404.15.12.B5 and social security ruling 96-03P require that these types of decisions from governmental agencies must be mentioned and must be considered by the ALJ. These are additional evidence. Now, you know, the argument, the counter argument is often is that, listen, he rejected Dr. Schneider. Dr. Schneider said he couldn't work. So therefore, by extension, he rejects Dr. Colby, although he didn't mention Dr. Colby. He doesn't even talk about him. That's not the way it works because the regulations say that the ALJ has to consider the consistency of the evidence. And if he didn't see Dr. Colby, that's opinion, that's evidence that she's disabled. It's consistent with Dr. Colby. In fact, it's consistent with Dr. Beatty and Dr. Kester, who the ALJ gave great weight to. And so it is not harmless error. It is a significant error, particularly in this type of a case where GAX, under the state of Washington, stands for general assistance for the unemployable expedited. And it means that the person meets SSI criteria for disability under Washington law, if you, if you get GAX. But it's not race judicata. You still have to go get, you actually have to get it. It's more like a preliminary injunction. It's saying like, okay, you got a decent chance of winning is what he basically said. So we put you on this pending the, the, the full hearing, right? Um, he put you on, he approved him for Washington state disability using SSI disability. I know, but the fact that someone did that does not per se mean you win at your final hearing in front of the ALJ, does it? No, it means that the ALJ has to consider that evidence in his decision-making process and has to say, Washington state, uh, granted disability, Dr. Colby did. I have to consider that. Is that consistent? Well, it's consistent with Dr. Schneider. And he did consider everything that Dr. Colby considered, right? He just, what he didn't mention was Dr. Colby's report, right? There's a, yeah, that's a. He considered the two reports that Dr. Colby. That's not enough though, judge, because. Well, I'm not saying whether it's enough or not, but I want to get the facts straight. He did consider the two reports that Dr. Colby considered, right? He considered Dr. Schneider's report and, um, he said it was, he said that it was inconsistent with Dr. Kester and Dr. Beatty's, which it turned out it wasn't because the vocational expert said both under both scenarios that, that Mr. Dubois could not work even those three jobs. All right. But that's still, did he consider the reports that Dr. Colby considered? I know he didn't mention Dr. Colby. Yeah, he didn't. And, and, and, and I think, is that, that's a yes or no. Yes. Okay. It's, that's not outcome determinative though. I didn't say it was. Right. I'm trying to just get, I'm trying to get the yes or no facts here. Yes. How extensive was the report that we're talking about? It was more extensive in the narrative than Dr. Kester and Dr. Beatty's report. It was a full page. Dr. Kester and Dr. Beatty's was three sentences and it represented about 43 words. Dr. Kester's one that the ALJ gave great weight to. So it was about three times the length of Dr. Kester's report. Even Dr. Colby's report is all on one page. On one page. The comprehensive evaluation that we have is from Dr. Schneider with multiple psychological testing with an in-depth psychological examination. This is the one that the ALJ, I guess, disagreed or didn't give great weight to Dr. Schneider because he felt it was inconsistent with the reported daily activities of your client. Is that correct? In part. He said, first he said it was inconsistent with Dr. Kester and Dr. Beatty. The report that is about a third of this, but which when Dr. Kester and Dr. Beatty's report was given to the vocational expert, the vocational expert said there'd be no jobs they could do. That was the first reason he gave because it was inconsistent. It is unusual here that there are a lot of things your client does. I mean, he drives, he rides bicycle, he plays tennis, he goes to church, he attends church functions, he has a bachelor's degree in computer and information technology. I mean, listening to that doesn't sound like a guy who can't do something in the economy. Yeah. Right. He never claimed he couldn't do anything. He, he's the one that claims he can do these things. See, that's the thing that's kind of backwards about this case to me, your honor, is because this guy has a family that's pushing him. That's behind him a hundred percent. He's pushing himself. He's behind him a hundred percent. He didn't want disability. He wanted DVR help. He wanted to be able to get retrained. He wanted to be able to work. So he, what did he do? He tried 10 different jobs. He got fired. He lost the jobs. What did he do? He started his own company. He never could make more than $400 in a total year, 12 months. This computer repair business. Right. And the judge doesn't mention that he only made a total of $400, doesn't mention that social security did an investigation of that job and found it wasn't substantial gainful activity. Has he tried any of the jobs that the ALJ said he could do? Well, he tried similar jobs. Yeah. He, not, not, not those exact jobs. No, but he, he found similar jobs in his detailed earnings history, which is in the, in the record at the D exhibits. It gives a list of 10 different jobs that he tried prior to this time. He, he's got no shortness for trying. That's what Dr. Schneider says. I'm impressed with this guy. He's got a lot of disabilities. He can't work. He can't sustain work. I'm sorry. His current age. His current age. He was, um, he was 35 when the hearing was or something. He was in his mid thirties. Yeah. Um, could I reserve my time or do you have any other questions? Okay. Thank you. Thank you. We'll hear from the government. Good morning. My name is John Lamont. I'm representing the acting commissioner of the social security administration. Well, we've got a guy here that has tried to do some things. I mean, he's one of these people though, that the disabilities that he has aren't necessarily physical. I mean, we obviously can't put him around kids, you know, we can't, he's not very good around people, you know, there's, so he is sort of a, an example of contradictions. Sure. And that's an interesting point. So, and the question isn't whether he can do the jobs that he could, that he tried to do, but whether he can do any jobs available in the national economy. And it's interesting, Mr. Tree points to his work record. And indeed that was one of the things the LJ considered because there's a fundamental inconsistency between a claimant like Mr. Dubois, who says that I've been disabled since birth because I have, uh, both psychological and mental impairments and someone who actually worked and who did so at substantial gainful levels. Now it's interesting to note in the record when he says there, I'm sorry. I, I will try to slow down. It's interesting enough time. It's interesting to note in the record, when he talks about the reasons that he couldn't complete those jobs or the reasons he lost his jobs, he says that it's because for instance, his depression, or he said the wrong, he said the wrong things to people, but then you look at what's actually in the record. And so he had, uh, his longest period of employment was from, uh, 1998 to 2000. He worked as a cashier for Fred Meyer. And in the, his hearing testimony, he, against, he says, well, depression got in the way and, uh, you know, I, I spoke out of turn to supervisors and I got, and I lost the job in that way, but actually the record shows that he exposed himself to children and he was arrested as a result of that and lost that work. And as for his, um, his, his other work attempts, that's a significant limitation now, well, the interesting thing about it is certain jobs that you can or cannot do. Absolutely. He goes to, well, two points on that. Your honor one is there, there could be a component in this case is, is his, his, his conviction, a barrier for him to getting a job. And that's something that's not, it could well be something that prevents him from getting a job, but it's not the kind of problem that the social security act, uh, is designed to fix. And the other interesting point is, so you say, well, maybe the problem, maybe the fact that he exposed himself to children, that shows that he has a disabling mental impairment, but you look at Dr. Schneider's report and he, and faster and faster, I'm sorry. You look at Dr. Schneider's report and he, uh, this is something that came up in the psychological examination and he said his, his, uh, how he exposed himself to children, how he lost his job. And Dr. Schneider says that, and I have the quote here. He says that quote, his excuse doesn't hold water with me or with anyone else. So even Dr. Schneider didn't accept that explanation that the reason he exposed himself to children was because of a sort of psychological impairment. Well, uh, how can we conclude though, that Dr. Schneider didn't have significant or probative evidence that the ALJ was required to address in that it seems, I sort of made the other argument with appellant's counsel, but it essentially, his conclusion is the same conclusion that an ALJ is going to be making. Well, it's an interesting, I think it's interesting that Mr. DuBois relies on this opinion. It's actually a bit puzzling because for two reasons, and one reason is that, um, he likes to compare it to a sort of disability opinion. For instance, the Veterans Administration makes disability opinions and that's something that the agency has to consider. And this court says that, well, those are based on similar rules. The VA applies those rules and they make a disability determination. But in this case, Dr. Colby didn't really make any sort of independent disability opinion. He just said there is a decent chance that SSA will find him disabled and set aside the fact that a decent chance isn't exactly a ringing endorsement. Okay, but to come to that conclusion, he had to look at some of the same reports that the ALJ looked at. And that was my second point, Your Honor. So another reason that I think it's interesting that he, that Mr. Tree relies on this opinion is because it actually tears apart the opinions he likes. So you look at, um, for example, so he talks about Russell Anderson, which is the social worker who evaluated Mr. DuBois, and he says that Mr. correctly and that there were no support for the cognitive limitations he identified. And Dr. Colby also has concerns about Dr. Schneider's opinion. He notes that Dr. Dr. Schneider found that Mr. DuBois had, uh, he had average IQ and he had average I, I, I achievement and he didn't find any justification for the diagnosis of a cognitive disorder. And he also found insufficient support for the other diagnoses that he made. So I think it's curious that he would cite this opinion. It doesn't say anything about how Mr. DuBois is limited. And, uh, and that's actually what a medical opinion is. And that's in the regulations. A medical opinion should say what a claimant can and cannot do. There's nothing in this, there's no limitation in Dr. Colby's opinion that a fact finder could incorporate into a residual functional capacity. You say it's not a medical opinion. It's, it's an opinion from an acceptable medical source. It does not have any. Can you get this? Uh, what, what do we call it? Uh, I know you all, the GACs, can you get certified to the GACs program without a medical opinion? Um, that is something I, I'm not familiar with the state of Washington. Well, your mom can't write in and say, give him the GAC, GACs program, right? But again, this isn't an opinion. Well, I'm just, okay. Are we parsing? You're correct. I, I, I, I actually, I don't know what it takes to get on the GACs program, but I assume that someone's mother. This person is a medical person. Sure. Absolutely. Okay. So, um, and this person's not writing in any other capacity than as a doctor, right? Absolutely. So if it's a medical, if we were to find it is a medical opinion, did the ALJ have to mention it? Not necessarily. So under this court's, uh, precedent, Vincent V. Heckler, uh, what the ALJ needs to do is discuss why significant probative evidence has been rejected. And let's think about what the ALJ is. So then it's not probative, but it's a medical, if even if it's a medical opinion, if it's not probative. Right. Because a medical opinion should be about what? I'm trying to understand your argument. I'm trying to talk, I'm trying to talk slowly because I don't talk slowly either. I'm sorry. You'll mirror me. Sure. Um, so right. Uh, when you talk about what significant probative evidence is, I think it's important to keep in mind what the ALJ is tasked with doing ultimately. And he needs to determine whether there are any jobs a person can perform. And in order to do that, he needs to find the evidence of how that person is limited. So when you have an opinion that says, for instance, when you have a statement, uh, that says like he, you know, he struggled throughout his life, that's not really something that you can put into a residual functional capacity finding. And here with the statement. Okay. Let's assume it's a medical opinion. Let's assume it has some probative value. Can you make a harmless error argument? I think you could, because when you look at whether, uh, whether an error is harmful, you need to determine whether it would change the outcome of the case. And one of the, I think one, there are a lot of ways to see whether something is harmless, but one of the ways to do it is to see if you credit the opinion. Does that, even if you accept what the person says, does that change the outcome in here? You accept what he says. It's that there's a decent chance that SSA will find him disabled. Well, there's a decent chance that SSA won't and they didn't. So there's no, but in terms of, so the reports that Dr. Colby considered were those reports that the ALJ considered. Yes, absolutely. The ALJ, uh, considered and talked about both of those. And at one point, I think it's, it's also worth noting that, um, just because the ALJ didn't discuss something in the opinion doesn't mean that that evidence wasn't considered. So I think there's a kind of a duality there and, uh, there's a difference between what needs to be discussed and considered. So talk to me about the hypothetical, because before the hypothetical, the vocational experts said that there was nothing that, uh, that, that Mr., I, I've been saying it Dubois, but it's Dubois, that it, that there was nothing he could do. Sure. Okay. So that kind of seemed like a death knell there. And then the hypothetical came. So tell me, uh, your counsel for the appellant has said that the hypothetical was wrong and. So sure. He relies on Dr. Kester and he says that the opinion proves that he's disabled. And he poses this, as you said, this is based on questions post to the vocational expert. But the problem is that counsel plucked, uh, he plucked check boxes out of section one of the mental residual functional capacity form. And he asked the person, the VE, whether a person with moderate limitations could perform work. And the VE said, no, but the problem is that the form itself says that a moderate limitation means that there is some degree of limitation and what that limitation is needs to be described in narrative section three. And in narrative section three, uh, Dr. Kester says that the claimant can perform simple, simple, uh, I think simple routine or simple repetitive tasks. Uh, so it's, it's, again, it's interesting that Mr. Tree cites this as support that shows that, uh, Mr. Dubois is disabled because this opinion is actually the reason, the reason he was found not disabled at initial consideration. This opinion, along with the, uh, the physical doctor's opinion controlled at initial consideration. And based on that opinion, he was found not disabled. And one thing I would, I want to point out, there was a 28 J letter filed, uh, yesterday afternoon in this case. It was a seventh circuit case called Varga. And that had to do with the sort of how this worksheet is considered. And I just want to distinguish that case because that was a case where the form was completed. And then, so again, you have, you have a summary conclusion section that guides the, the psychologist in making, in formulating his opinion. And then to the extent moderate boxes are checked, you need to describe what the degree of limitations are. And in that case, the doc, the DDS doctor wrote C electronic worksheet in the narrative, and that wasn't in the record. So I think that case is easily distinguishable from this one. This is one, not only where he filled out that he, he provided a narrative, but he also provided additional, uh, explanation at page three 16 of the electronic, uh, of the excerpts of record. And also in that narrative, he talks about the reasons that he disagreed with Dr. Schneider. So when Mr. Tree says that there were three sentences there, that's, that's just not accurate. Uh, so one thing I just wanted to emphasize in this case was the timeline. So it's, it's easy to pick out pithy one-liners and say, and to get bogged down than those. And, you know, they go both ways, but I think a timeline gives perspective and it shows that the ALJ's conclusions are reasonable. And this is a case where the claimant said that he has been disabled since birth because of both physical and psychological impairments, but he graduated from high school. He did not, he was not in special education classes. He worked as a cashier from 1998 to 2000. Again, this is not the kind of work that he would have to do under the residual functional capacity finding because he's not to have contact with the public and he's to have only superficial contact with coworkers and supervisors.  Uh, but the record shows they actually lost his job as a cashier because he was arrested for exposing himself to children. And as I said, even Dr. Schneider didn't buy Mr. Dubois' explanation that that was because of his mental health impairments. At the, on the record at page 285, he says that excuse doesn't carry any water with me or with anyone else. And after this conviction, Mr. Dubois worked, but only in short term contract positions. Next he had court ordered psychosexual therapy, but he didn't engage in any other mental health treatment until late 2010. This was in spite of the fact that as early as 2005, Mr. Dubois was told that his problems could be effectively managed with medication from his primary care provider. Now, counsel, may I ask you, what is your position regarding the portions of the mental residual functional capacity assessment? Which portions of those are you saying should be considered and which ones should not be considered? Are you saying that there are certain portions of that form that are not relevant? It's not that they're not relevant. It's that the physician already accounted for, the physician already accounted for them in creating the narrative about what the person can do. So it's not that anyone's ignoring them. There's these worksheet checkboxes and that's just sort of like a medical frame, a guide for the medical decision maker to sort of summarize what's going on and then to what the limitations are. So it's not that it's not considered. It's that those boxes are encompassed in the narrative that explains them. And that's set out in the form itself that says, if you check moderate, you should explain what the limitation is. It's set forth in the POMS that the DDS people use as guidance when they're filling out those forms. So what are you relying on to take the position that the more important focus is on I don't understand why you think it's necessary to make that point. I'm not sure I followed the question. I mean, so to me, it seems like you're minimizing Section 1. Why do you, what drives that? Why, what would be the impetus for minimization? Again, two things. One is that the form says that, one, you need to know what moderate means and moderate isn't really defined, except that there is some limit. What that limit is needs to be defined. So if you say, if you go to a vocational expert and you say, this box was checked moderate, can a person with moderate limitations do work? That doesn't really capture what's in the form because for the physician who completed that form, both in terms of the instructions on the form and the policy guidance that is connected to that form, moderate means there is some limitation. Collect all of those moderate, collect all of those capacities in which there's some moderate limitation and set forth a narrative exactly what the limitations are. Is there a regulation or a case that supports your premise that Section 1 is encompassed in Section 1? There are two cases that are relevant. The only published case in this court that really gets to it in detail is Stubbs Danielson versus Estrue. That's cited in the briefs. Also, Israel versus Estrue is an unpublished case from this court that interprets it as Stubbs Danielson. And it does have some substantive reasoning in there. So I think that it's worth considering. Is there a particular language in Stubbs Danielson that you're relying on to say that Section 1 is less helpful or should be subordinated to Section 3? What page are you relying on? So if you go to Stubbs Danielson, I am not sure if the page is under it. There's subheading 2, Rejection of Certain Testimony. Under subheading 2? There's a 2, ALJ's Reduction of Certain Testimony. And then there's a sub I, the Hypothetical Question, Did Not Improperly Reject the Opinions of Stubbs Danielson's Doctor. And then it goes down and it talks, I think in the third paragraph, it says the ALJ translated Stubbs Danielson's condition, including the pace and mental limitations. So you go down a bit more and it talks about, and this is what I would really draw the court's attention to, as two of our sister circuits have recognized an ALJ's adequately captures limitations. This is a specific box that was checked in that form just for context. Right. But you're extrapolating now. Right. Well, if you look at, I think you go to Howard v. Massanari, it's a similar case. So there's many permutations of this issue. And I think this is the simplest one because it's one where the checkboxes and the narrative, how those checkboxes are interpreted are from the same physician. This case doesn't say that. Right. I know. This is that the case doesn't say that, but I'm sort of trying to note that there are different permutations of this issue in terms of what the checkboxes mean and what the narrative means. And I think this case is the simplest permutation of that because the physician who checked the boxes is the same physician who explained what those mean. So it's, I think it's relative, it's different than. So bottom line is it's basically your interpretation. Right. So again, but in terms of what this court has said about this issue. I'm not saying it's an unreasonable interpretation, but when we ask you for the best case, then as you can see, then we take you and we're saying, okay, we don't see that. I would say look at subs Danielson and Israel. And I see my time is concluded. Well, just for generally, I think that those are the cases that would guide this court in resolving the issue. And unless there are any further questions, I'm just curious why you want to minimize section one, because the form, the agency has developed this form for a reason. And one would assume that every part of the form has a purpose. So I'm just curious why you think that it helps your case to minimize the effect of section one. I don't get that. The reason is, is it's a guide for medical decision making. So that's a different, that's a different consideration than when you're putting it to a vocational expert and you say, what does this mean? Because Mr. Tree took these check boxes to the vocational expert and said, what does the person say? If it said no limitations, would you be minimizing section one? If later in it, it showed that there were some limitations, I don't think you would be. I would be surprised if Mr. Tree would then ask the vocational expert if a person with no limitations could work, but you never know. All right. Thank you, counsel. Thank you. Okay. Section one, 20 sentences that Dr. Kester and Dr. Beatty agreed with, presented to the vocational expert at the, Mr. Lamont says that at the initial level, Mr. Du Bois was denied because of this. There was no vocational expert at the initial level. There was no vocational expert at the reconsideration level. The first time we had a vocational expert is at the hearing level. That's not uncommon though, right? That's common. That's the way it is in every case. Yeah. But so that's not, you're saying like, that's like, this was some sort of aberration. It's the regular way that they do it. It's the regular way. Okay. Yeah. But the point of that, Your Honor, is that a psychologist, just because he says a person can work, that doesn't mean he has the vocational expertise to say that. What a psychologist does, he gives limitations. And then we present those limitations to the vocational expert to find out if he can work with those limitations. And a hypothetical, and that's how you develop your hypotheticals. You develop the hypotheticals that you think are the best case scenario for your client to be disabled. And the ALJ may develop different hypotheticals based on what he or she has discerned from the evidence. So. Correct. Okay. Yeah. And exactly what happens. And so that's what happened in this case, except the funny thing is the ALJ accepts this. Right in his decision on page 25, when he talks about Dr. Kester, he didn't just talk about, see section three, this is what section three is. It's on page 302. It is three sentences. It's right there. Three sentences. One, two, three. Mr. Lamont said I was wrong, but that's what it is. You can look at it. 302. That's the entire section three evidence is right there. And he argues, you know, that should be used. These two pages, these 20 sentences shouldn't be used. But the ALJ, see, he didn't find that. ALJ found that Dr. Kester found marked limitations on section one. And I give this great weight. See, and so the ALJ incorporates section one into his decision at page 25, when he talks about Dr. Kester, he accepts it. This is medical evidence. But is your point then that once the ALJ accepted a determination that there were marked limitations, he was required to find a disability? Is that your argument? My argument is that since the ALJ accepted this and didn't reject it and gave it great weight, and since this was presented verbatim to the vocational expert, and since the vocational expert said there was no jobs he could do, including the three jobs that the ALJ found he could do, and since the ALJ did not reject the vocational expert testimony, then we need to credit this as true, the ALJ accepted it as true. Well, it's sort of interesting. Both of you approached this case from the standpoint that ALJs don't do something different than everyone else. And the courts don't do something different than what you tell us to do. And so, I mean, there is a function separate and apart from what, you know, ALJs assess, you make your argument of how they should look at it, you make your argument of how you should look at it, but then ALJs have a function and there's the five steps that they go through. And so I think what Judge Rawlinson is saying, just because someone says this is one person's opinion, does it ergo follow that the ALJ has to find that? Or just because you each make arguments that we have to follow what either of us say, there seems to be this distinct missing part that we do a separate function and an ALJ does a separate function and that somehow, you know, but I mean, they may not do it correctly, we may not do it correctly, and that's why there's review points. Yeah. And I think the significance in this case, though, is that we would be having quite a different conversation if the ALJ had said, and he very well could have, because I presented the hypothetical to the vocational expert at the hearing based upon these section ones and the ALJ was sitting right there. He knew it. He could have very well have said some additional questions to the vocational expert. He could have very well in his decision say, I reject section one for these reasons. Then we would have been having a discussion of, did the ALJ properly reject these opinions? That would have been our discussion, but the ALJ didn't do that. He gave this great weight. He listened to the hypothetical. He was there. He heard it. He didn't rebut it and he accepted it. That's the point of this case. It's an unusual case. I'll agree with you. And I would like to say that, in a way of admission, that I was the counsel on Stubbs-Danielson and we lost that case, but it didn't stand for this proposition of section one versus section three. That was quite a different case. That had to do with the PRTF, the Psychiatric Review Technique form, and the question in there of whether or not you had difficulty with concentration, persistence, or pace on the PRTF form, and whether or not the ALJ encapsulated that in his hypothetical to the VE, because in that case, the ALJ did reject evidence. The ALJ did reject the vocational expert. It's quite a different case than we have here. All right. Thank you, counsel. Thank you very much. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Gilman, Rawlinson, Callahan